AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Seizure of
*(Briefly describe the property to be seized)*
All USDT on deposit held in Target Address - 0x01d05211e6a202c399961dc7398f8a26790b534b

Case No. 25-mj-01903

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or an attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that on the following property in the Southern District of California is subject to forfeiture to the United States of America under 18 U.S.C. § 981(a)(1)(C) 982(a)(2)(A) *(describe the property)*:

All funds, in their entirety, 3,275,100.094002 Tether ("USDT") held in Target Address: 0x01d05211e6a202c399961dc7398f8a26790b534b

The application is based on these facts:

See Attached Affidavit of Special Agent Jeremy Keeney, USSS, incorporated herein by reference.

☑ Continued on the attached sheet.

Jeremy Keeney
*Applicant's signature*

Special Agent Jeremy Keeney, USSS
*Printed name and Title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means).*

Date: April 16, 2025

*Judge's signature*

City and state: San Diego, CA

Hon. Michael S. Berg, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A: PROPERTY TO BE SEIZED

Pursuant to this warrant, Tether shall provide the law enforcement officer/agency serving this document with the equivalent amount of USDT tokens that are currently associated with the virtual currency address referenced below (i.e. 3,275,100.094002 Tether ("USDT") held in Target Address 1). Tether shall effectuate this process by (1) burning the USDT tokens currently associated with the virtual currency address referenced below and (2) reissuing the equivalent value of USDT tokens to a U.S. law enforcement-controlled virtual currency wallet. Tether shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate its implementation.

- Target Address 1, identified by:
  0x01d05211e6a202c399961dc7398f8a26790b534b

# AFFIDAVIT IN SUPPORT OF APPLICATION

I, Jeremy Keeney, Special Agent with the United States Secret Service ("USSS"), having been duly sworn, hereby state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a seizure warrant for the equivalent value of the cryptocurrency Tether ("USDT") (**"Subject Funds"**) stored in the following cryptocurrency wallet addresses (**"Target Addresses"**):

a. All Tether held in a wallet address identified by 0x01d05211e6a202c399961dc7398f8a26790b534b (**Target Address 1**); and

b. All Tether held in a wallet address identified by TRfAgJaahb71zaoXm6AoNS7JmCvQUzsxtd (**Target Address 2**).

2. **Forfeiture of Proceeds or Proceeds Traceable to Wire Fraud and Wire Fraud Conspiracy.** As set forth below, I respectfully submit that there is probable cause that the Target Addresses contain property that constitutes or is derived from proceeds traceable to violations of 18 U.S.C. §§ 1343 (wire fraud) and 1349 (conspiracy to commit wire fraud). The Target Addresses are, therefore, subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A) and 28 U.S.C. § 2461(c).

3. **Forfeiture of Property Involved in Money Laundering.** As set forth below, I also respectfully submit that there is probable cause that the Target Addresses are and/or contain property that was involved in transactions in violation of 18 U.S.C. §§ 1956, 1957. The monies, funds, and credits on deposit in the Target Addresses are, therefore, subject to seizure and forfeiture in their entirety to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).

4. **Instructions to Financial Institution in Attachment A.** This application includes seizure instructions to the financial institution as set forth in Attachment A, which is incorporated herein by reference. These instructions

facilitate the efficient execution of the instant seizure warrant, which in turn helps expedite the repatriation of seized funds to victims.

## INTRODUCTION AND EXPERTISE

5. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants.

6. I have been employed as a Special Agent with the United States Secret Service ("USSS") since May 2024. I am a graduate of both the USSS James J. Rowley Training ("JJRTC") center in Beltsville, Maryland, and the Federal Law Enforcement Training Center's ("FLETC") Criminal Investigator Training Program in Glynco, Georgia. Additionally, I completed Cyber Foundational Training at the National Computer Forensics Institute ("NCFI") in Hoover, Alabama, which provided extensive training and experience dealing with cyber investigations, computers, cyber related crimes, business email compromises, and various other topics relating to technology and its use in facilitating crimes. Prior to my tenure as a Special Agent, I served as a Protective Intelligence Research Specialist (PIRS) for the USSS Protective Intelligence and Assessment Division (PID). In the course my duties as a PIRS, I utilized several open-source investigative tools and internet search engines to track and identify active threats to USSS protectees. Additionally, I have graduated from the Internet Investigations Training Course through FLETC in Glynco, GA. My educational background includes a master's degree from American University in Justice, Law, and Criminology with a concentration in Terrorism and Homeland Security Policy where I took courses including Cyber Policy and Intelligence Analysis. I also have had additional training and on-the-job

experience with other federal, state, and local law enforcement agents/analysts in connection with the investigation of said offenses and related offenses.

7. I am currently assigned to the San Diego Field Office and the SoCal Cyber Fraud Task Force ("SoCal CFTF"). The SoCal CFTF is a task force sponsored by the USSS that is comprised of state, local, and federal law enforcement personnel. In this capacity, my duties are to investigate violations of federal and state law, including financial crimes and related activity in connection with the fraudulent use of access devices, credit card skimming/re-encoding, identity theft, wire fraud, mail fraud, check fraud, bank fraud, the manufacturing of counterfeit currency/commercial securities, and the use of complex schemes to conceal and launder the proceeds of such crimes. Based on my training and experience, I am familiar with the criminal elements and schemes commonly employed by persons who commit these types of violations. I am also familiar with the use of computers and specialized electronics to commit these crimes.

8. The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals, including USSS analysts, during my participation in this investigation; my review of documents, records, and reports related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that I or others have learned during this investigation. Dates, times, and amounts are approximate. If a full email address is listed, I have replaced the "@" symbol with "//" to avoid creating active hyperlinks within this affidavit. Because this affidavit relates to an ongoing, complex investigation, involving millions of dollars and dozens of victims, the facts set forth in the affidavit are as best known to me at this point in the investigation. As the

investigation unfolds, my understanding of the exact nature of the scheme, the identity of the targets, among other facts, may evolve, but I have done my best to present the facts as currently known to investigators.

## STATUTES AT ISSUE

**The Target Offenses**

9. The Target Offenses are the following: 18 U.S.C. §§ 1343 (wire fraud), 1349 (conspiracy to commit wire fraud), and 1956-1957 (money laundering).

10. Wire fraud is where a defendant (1) knowingly participates, devises, or intends to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of a false or fraudulent pretenses or representations or promises; (2) the statements are made as part of the scheme are material, which means to influence or capable of influencing a person to part with money/property; (3) defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) defendant used or caused to be used an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

11. 18 U.S.C. § 1349 covers attempts and conspiracies to commit mail, wire and/or bank fraud. A conspiracy is an agreement between two or more persons to commit a criminal offense, for example, mail and wire fraud.

12. Money laundering covers a broad array of criminal conduct, including where a defendant (1) conducts or attempts to conduct a financial transaction involving property that represents the proceeds of specified unlawful activity (*e.g.*, wire fraud); (2) knew the property represented the proceeds of some specified unlawful activity; and (3) defendant either (i) knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds; or (ii) acted with the intent to promote the carrying on of the specified unlawful activity. *See* 18 U.S.C. §§ 1956. Conspiracies to commit money laundering are covered under 18 U.S.C. § 1956(h). Money laundering also covers instances when a defendant (1) knowingly engages or attempts to engage in a

monetary transaction; (2) knew the transaction involved criminally derived property; (3) the property had value greater than $10,000; and (4) the property was in fact derived from some specified unlawful activity (such as wire fraud); and (5) the transaction occurred in the United States. 18 U.S.C. § 1957.

**The Forfeiture Statutes**

13. **Forfeiture of Proceeds or Proceeds Traceable to Wire Fraud and Wire Fraud Conspiracy.** Under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §§ 1343 (wire fraud) and 1349 (wire fraud conspiracy) is subject to criminal and civil forfeiture.

14. 18 U.S.C. § 981(b)(2) authorizes the seizure of property that constitutes or is derived from proceeds traceable to wire fraud. Specifically, Section 981(b)(2) authorizes the seizure pursuant to a warrant obtained in the same manner provided for a search warrant under the Federal Rules of Criminal Procedure.

15. 18 U.S.C. § 982(a)(2)(A) provides that the Court in imposing a sentence on a person convicted of wire fraud in violation of 18 U.S.C. § 1343 or conspiracy to commit such a violation in violation of 18 U.S.C. § 1349 shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly as the result of such violations.

16. **Forfeiture of Property Involved in Money Laundering.** Under 18 U.S.C. § 981(a)(1)(A) and 982(a)(1), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or any property traceable to such property, is subject to criminal and civil forfeiture.

17. "Property involved" in money laundering is broader than just proceeds and includes money or property being laundered, commissions or fees, and any property used to facilitate the money laundering offense. Property used to facilitate the money laundering offense includes the use of legitimately-sourced money that is commingled with tainted money under the theory that the commingling of the money

helps conceal the nature of the tainted funds. That is because "in a money laundering charge, the commingling of tainted money with clean money taints the entire account." *United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009); *United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005) (affirming multimillion dollar forfeiture order of crop-sales that were commingled with money obtained from fraud under a commingling theory of forfeitability).

18. Under 18 U.S.C. § 981(b)(3), a seizure warrant may be issued by a judicial officer in any district in which a forfeiture action against the property may be filed under 28 U.S.C. § 1355(b) and may be executed in any district in which the property is found; or where acts or omissions giving rise to the forfeiture occurred.

19. 18 U.S.C. § 982(a)(1) provides that the Court in imposing a sentence on a person convicted of money laundering in violation of 18 U.S.C. §§ 1956-1957 shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

**Venue is Appropriate in this District**

20. Venue is proper in this District for the seizure and civil forfeiture of the Target Addresses pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district. 18 U.S.C. § 981(b) sets forth that property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed." 18 U.S.C. § 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. 21 U.S.C. § 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

**DEFINITIONS AND BACKGROUND**

21. The **FBI Internet Crime Complaint Center ("IC3")** is an online government portal where an individual or an individual's representative who has been the victim of cyber-crime can file a complaint reporting the criminal activity to

the FBI and other law enforcement entities such as the US Secret Service. IC3 involves four main categories of criminal activity, including business email compromise, ransomware attacks, elder fraud, and other cyber-crimes, including Romance Scams, Pig Butchering, and the like. Based on my training and experience, the IC3 complaint database can help investigators identify other victims of a fraud scheme beyond those initially identified by investigators. Individuals who file a complaint must also digitally sign the document and affirm that the information they have provided is true and accurate to the best of their knowledge. Complainants must affirm that they understand that providing false information could make them subject to a fine, imprisonment, or both, under 18 U.S.C. § 1001.

22. **Virtual currencies** are digital representations of value that, like traditional coin and paper currency (fiat currency), function as a medium of exchange (i.e., they can be digitally traded or transferred for value and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ethereum, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a "distributed ledger" known as a "blockchain," and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

23. **Virtual currency addresses** are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a

bank account number and is represented as a string of alphanumeric characters. Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

24. **Virtual currency wallets** are software applications that interface with the virtual currency's specific blockchain and generate and store a user's addresses and private keys. A virtual currency wallet also allows users to send and receive virtual currencies. Multiple addresses can be stored in a wallet.

25. **Virtual Asset Service Provider ("VASP")**, also known as a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VASPs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VASPs also store their customers' virtual currency addresses in hosted wallets. Such a wallet is known as a custodial wallet because the VASP is the third-party custodian of the cryptocurrency. Alternatively, a user of cryptocurrency may elect to keep their cryptocurrency in their own wallets (i.e., self-hosted, non-custodial, or cold storage wallet). A custodial wallet is the functional equivalent of a bank holding a customer's cash. Criminals often seek to use VASPs to trade illicitly obtained cryptocurrency for cash. VASPs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where virtual currency transactions occur directly between parties).

26. **Blockchain** is the location where many virtual currencies publicly record all their transactions. The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable, historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that ever received

that virtual currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

27. Although the identity of an address owner is generally anonymous (unless the owner opts to make the information publicly available), **blockchain analysis, coupled with traditional investigative methods,** can often be used to identify the owner of a particular virtual currency address. This can be done through the use of public blockchain explorers, commercial analytics tools, etc. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity. A user of virtual currency can utilize multiple addresses at any given time and there is no limit to the number of addresses any one user can utilize.

28. **Stablecoins** are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. USDC, for example, is one stablecoin pegged to the U.S. dollar. Stablecoins achieve price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

29. **Tether**, known as "USDT," is another blockchain-based stablecoin whose tokens are purportedly backed by an equivalent amount of U.S. dollars. Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens. USDT is hosted on the Ethereum blockchain, as well as other blockchains (i.e. Tron, Solana, Polygon, etc.). Like other virtual currencies, USDT is sent to and received from USDT "addresses," which are often represented as a 46- to 48-character-long case-sensitive string of letters and numbers. Users can operate multiple USDT addresses at any given time, with the possibility of using a unique USDT address for every transaction.

30. **Ethereum** ("ETH") and **Tron** ("TRX") are examples of cryptocurrencies that are both open source, public, have a blockchain, and are distributed on a

platform that uses "smart contract" technology. The public ledger is the digital trail of these blockchains, which allows anyone to track the movement of ETH and TRX.

31. **Smart contracts** allow developers to create markets, store registries of debts, and move funds in accordance with the instructions provided in the contract's code, without any type of middleman or counterparty controlling a desired or politically motivated outcome, all while using blockchain protocols like Ethereum to maintain transparency. Smart contract technology is one of Ethereum's distinguishing characteristics and is an important tool for companies or individuals executing trades on Ethereum and other smart contract blockchains like Tron. When engaged, smart contracts automatically execute according to the terms of the contract written into lines of code. A transaction contemplated by a smart contract occurs on the respective smart contract blockchain and is both trackable and irreversible.

32. A **cryptocurrency bridge**, also known as a **blockchain bridge** or **cross-chain bridge**, is a protocol that connects two different blockchains (i.e., Ethereum and Tron), allowing users to transfer cryptocurrency from one blockchain to another. Bridges often employ a mechanism such as the mint-and-burn protocol, whereby a token is locked up in one blockchain and its equivalent is minted on the second, allowing interoperability between two completely different blockchain protocols.

33. **Pig Butchering** is an investment fraud scheme. The term, originating in China, alludes to the practice of fattening a hog before slaughter. Based on data submitted to the FBI's IC3 (located at https://www.ic3.gov/), in 2022 alone, pig butchering schemes targeted tens of thousands of victims in the United States and resulted in over $2,000,000,000 in private assets being siphoned overseas. Pig butchering schemes begin by criminals contacting potential victims through seemingly misdirected text messages, dating applications, professional meetup groups, etc. Next, using various means of manipulation, the criminals gain the victim's affection and/or trust. Criminals refer to victims as "pigs" at this stage because they concoct elaborate stories to "fatten up" their victims.

34. **Exhibit 1 – Pig Butchering Flow**




35. Once that trust is established, the criminals often recommend cryptocurrency investment opportunities by touting their own, or an associate's, success in the field. Means of carrying out the scheme vary, but a common tactic is to direct a victim to a fake investment platform hosted on a fake website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The criminals assist the victim with opening a cryptocurrency account, often on a U.S.-based exchange such as Coinbase, Crypto.com or Kraken, and then walk the victim through the process of transferring money from the victim's bank account to that cryptocurrency exchange. Next, the victim will receive instructions on how to transfer their newly-purchased cryptocurrency assets to the fake investment platform.

37. Over time the platform purportedly shows that the victim has earned lucrative returns, encouraging further investment; underneath, however, all deposited funds have been re-routed to a cryptocurrency wallet address controlled by the criminals – the "butchering" phase of the scheme.

38. Pig butchering perpetrators frequently allow victims to withdraw some of their "profits" early in the scheme to engender trust and help convince victims of

the legitimacy of the platform. As the scheme continues, victims are unable to withdraw their funds and are provided various excuses as to why. For example, the criminals will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just a last-ditch effort by the criminals to elicit more money from victims. Ultimately, victims are often locked out of their accounts or give up after realizing they have lost all their funds.

36. The cryptocurrency ecosystem is used by criminals not only to receive victim money, but to launder it quickly, anonymously, and at scale. Like traditional money laundering, laundering money through cryptocurrency shares the same three stages: placement, layering, and integration:

- **Placement** - Criminals use non-custodial, or "private" wallets to initially receive victim funds. Such wallets are unattributable by law enforcement using blockchain analysis alone, are simple to create, and can accept large transaction amounts without additional scrutiny.
- **Layering** - Next, criminals will have victim funds transverse numerous private wallets, consolidate with other illegitimate and sometimes legitimate funds, and be subjected to other more cryptocurrency-specific processes (e.g. bridging) to obfuscate both the origin of, and the ultimate destination for, the victim funds.
- **Integration** - Finally, by using a diffuse network of "brokers," who agree to exchange cryptocurrency for fiat currency using various means, criminals render their proceeds liquid and fully integrated with the legitimate financial system.

## PROBABLE CAUSE THAT A CRIME WAS COMMITTED

### A. Investigation Background

37. In September 2024, a 58-year-old San Diego County resident (Victim - SW) reported to the United States Secret Service (USSS) that she had been the victim of a cryptocurrency pig butchering investment scheme. Victim-SW sustained a loss

of approximately $528,163.00. While investigating the pig butchering scam targeting Victim-SW, the USSS quickly identified IC3 complaints of three related victims who had fallen victim to nearly identical scams. These victims sustained losses of $366,555.00, $40,021.10, and $70,000.00, respectively. Several additional victims of nearly identical scams were identified during the investigation. As set forth more fully below, a USSS analyst traced funds from all victims to either one or both Target Addresses. The Target Addresses were then frozen pending a seizure warrant. In most instances the victim's funds traced to Target Address 2 were first laundered through Target Address 1, indicating that the two addresses were connected to the same scam and controlled by the same criminal network.

**B. The Fraud Scheme**

38. **Victim-SW is defrauded out of $528,163 via a Pig Butchering scam.** In October 2024, the San Diego Field Office of the United States Secret Service was notified by USSS HQ of a report filed by San Diego County victim, "SW." In her filed IC3 complaint, Victim-SW stated "I can't believe that I fell for this, but I went deeper and deeper. All together I transferred 525K. It is every penny I have. I have never done anything like this, but it seemed so real."

39. Through conversations between Victim-SW and a USSS Network Intrusion Forensic Analyst (NIFA), it was learned that in late May 2024, Victim-SW had been added randomly to a cryptocurrency investment group on the messaging application WhatsApp. The group consisted of numerous individuals boasting about their successes in cryptocurrency investing. Intrigued by their stories, Victim-SW reached out to a Telegram messaging application profile, Exhibit 2, that had been openly discussed and advertised in the WhatsApp group.

40. **Exhibit 2 – Fraudulent Telegram Trading Group**




41. Upon joining the Telegram chat, Victim-SW was directed by the scammers to open an account at the fictitious investment website https://www.zc-txn.com (hereafter referred to as ZC-TXN). Like many fraudulent cryptocurrency investment websites, ZC-TXN had been established shortly before the scam began. In this instance, ZC-TXN was created on April 22, 2024, one month before Victim-SW first communicated with the scammers.

42. **Exhibit 3 – Registrar Information for ZC-TXN.com**

**Whois Record** for Zc-Txn.com

**– Domain Profile**

| | |
|---|---|
| **Registrar** | TUCOWS, INC. Tucows Domains Inc.<br>IANA ID: 69<br>URL: http://tucowsdomains.com,http://www.tucows.com<br>Whois Server: whois.tucows.com<br>domainabuse@tucows.com<br>(p) +1.4165350123 |
| **Registrar Status** | clientTransferProhibited, clientUpdateProhibited |
| **Dates** | 206 days old<br>Created on 2024-04-22<br>Expires on 2025-04-22<br>Updated on 2024-05-13 |
| **Name Servers** | JOBS.NS.CLOUDFLARE.COM (has 25,432,333 domains)<br>MALLORY.NS.CLOUDFLARE.COM (has 25,432,333 domains) |
| **IP Address** | 104.21.85.108 - 695 other sites hosted on this server |
| **IP Location** | - California - San Jose - Cloudflare Inc. |
| **ASN** | AS13335 CLOUDFLARENET, US (registered Jul 14, 2010) |
| **Domain Status** | Registered And No Website |
| **IP History** | 1 change on 1 unique IP addresses over 0 years |
| **Hosting History** | 4 changes on 3 unique name servers over 0 year |

**Whois Record ( last updated on 2024-11-14 )**

43. Victim-SW made an initial investment of approximately $2,000 into the platform by sending funds from her Coinbase account to a deposit address provided on the ZC-TXN website. Trading consisted of several short duration trades (90 seconds) that were executed by "SW" at the direction of the Telegram group. "SW" related that after being "baited" with a series of successful trades, her initial $2000 deposit went to zero after repetitive losses. Victim-SW was led to believe by the scammers that she needed to "upgrade" her account by making a larger deposit of $20,000 into the platform to have the same successes as the other members of the group. As part of the upgrade, Victim-SW was assigned a one-on-one trading advisor named "Mr. Logan Davis" with whom she communicated exclusively via Telegram.

44. **Exhibit 4 & 5 – Victim SW's ZC-TXN $2.9 million Account Balance & Screenshot of Trading Advisor "Logan Davis"**







45. By trading at the direction of "Mr. Davis," Victim-SW was led to believe that her $20,000 investment had rapidly grown to almost $3,000,000 as reflected on the fraudulent ZC-TXN platform. Exhibit 4. Believing she had realized such incredible investment returns, Victim-SW decided to withdraw her funds but was told she first needed to make an 8% deposit for "Gas" fees into the platform. Victim-SW did as she was instructed. Victim-SW was then told that she needed to make an additional 2.5% deposit for tax, which she did. When Victim-SW tried to withdraw

her funds again, she was told she needed to transfer an additional $160,000. Victim-SW eventually realized she had been scammed after sending approximately $528,163.00 to ZC-TXN affiliated cryptocurrency addresses. Despite her inability to withdraw any of her funds and ceasing communications with the scammer's months prior, Victim-SW was still being actively pursued for additional funds by the group via email and chat messages as of October 2024.

46. **Exhibit 6 – Continued solicitations for funds by scammers**

Gmail [redacted]

**(no subject)**

**Crypto Support center** <dj246995@gmail.com> Thu, Oct 10, 2024 at 8:40 AM
To: [redacted]

Hello! I am the customer service representative of the Blockchain Network Management Center. The system has detected that your cryptocurrency account has been inactive for a long time and has not paid $160,000 for channel funding support processing. If it continues to be inactive, a 1%-5% late payment fee will be incurred every day. Please pay as soon as possible to avoid any adverse effects and ensure that the withdrawal is successfully credited to your Coinbase crypto wallet.
Special reminder! Thank you for your support and cooperation!

47. During the investigation, Victim-SW provided her Coinbase records which included transaction details for the scam deposit addresses she had been directed to send funds to. The scam deposit addresses are often used as a forward-facing address that the scammer will display on their investment platform (as in this case) or furnish to the victims via other means such as chat messages. These types of addresses are often provided to the victim for their cryptocurrency investment deposits. Based on my training and experience, I know criminals use these addresses to induce victims to pay into fraudulent cryptocurrency wallets. Once the funds are deposited into a scam address, they are stolen by being rapidly transferred through other addresses operated by the scammers. Often, victim funds are stolen and depleted from the scam address, and the so-called "platform trades" never occur.

48. **Exhibit 7 - One ZC-TXN deposit address provided to "SW"**




49. **Table 1 – "SW's" Transfers to Addresses provided by ZC-TXN website**

| DATE | SENDING ADDRESS | RECEIVING ADDRESS | SHORTENED NAME | AMOUNT IN USD |
|---|---|---|---|---|
| 5/30/2024 | Coinbase | 0xec3765cd43784e3eae58786b515313fff0e6aa9d | Deposit Address 4 | $2,558.12 |
| 7/5/2024 | Coinbase | 0xec3765cd43784e3eae58786b515313fff0e6aa9d | Deposit Address 4 | $19,990.00 |
| 7/18/2024 | Coinbase | 0x9f44973495717fc2956d3d48c9019a38e4644c4d | Deposit Address 2 | $149,988.94 |
| 7/23/2024 | Coinbase | **0xdf1259e287d2ab1cd458aedfeec8e1e75ba38090** | Deposit Address 1 | $998.93 |
| 7/23/2024 | Coinbase | **0xdf1259e287d2ab1cd458aedfeec8e1e75ba38090** | Deposit Address 1 | $38,988.92 |
| 7/25/2024 | Coinbase | **0xdf1259e287d2ab1cd458aedfeec8e1e75ba38090** | Deposit Address 1 | $49,988.05 |
| 7/29/2024 | Coinbase | 0xdf1259e287d2ab1cd458aedfeec8e1e75ba38090 | Deposit Address 1 | $34,008.25 |
| 7/30/2024 | Coinbase | 0xdf1259e287d2ab1cd458aedfeec8e1e75ba38090 | Deposit Address 1 | $1,997.74 |
| 8/1/2024 | Coinbase | **0x9f44973495717fc2956d3d48c9019a38e4644c4d** | Deposit Address 2 | $100,977.67 |
| 8/5/2024 | Coinbase | 0xdf1259e287d2ab1cd458aedfeec8e1e75ba38090 | Deposit Address 1 | $53,688.57 |
| 8/8/2024 | Coinbase | **0xa6744d4138d4c887bf9ef3626478fa3a1ccc61de** | Deposit Address 3 | $49,989.20 |
| 8/9/2024 | Coinbase | **0xa6744d4138d4c887bf9ef3626478fa3a1ccc61de** | Deposit Address 3 | $24,988.88 |
| | | | | |
| | | | | **$528,163.27** |

50. All of the scam deposit addresses used by Victim-SW bore the same suspicious characteristics, including rapid movement of incoming funds, recent or relative creation dates just prior to receiving victim transfers, short lifespans ranging from two to three weeks on average, and dormancy after the funds were depleted. Additionally, all four deposit addresses were unique to Victim-SW, meaning the only significant payments these addresses received were from her account at

Coinbase. Based on my training and experience, these characteristics are common and highly indicative of funds collection from pig butchering scams.

**Blockchain Analysis – Victim SW's funds to Target Address 1**

51. As a result of her identification of the deposit addresses provided to her on the ZC-TXN platform, the USSS NIFA used blockchain analysis to trace the flow of her funds. Based on the commonly accepted last in-first out (LIFO) accounting principle, which assumes that the last, or most recent, incoming assets are the first expended or sent out, a significant portion of Victim-SW's funds were traced through intermediary addresses to **Target Address 1.**

52. **Exhibit 9 – Flow of "SW's" funds from Coinbase to Target Address 1**




53. Six of the payments made by Victim-SW to the deposit addresses, as annotated in bold in Table 1 were all sent in their entirety to Consolidation Address 1 (0x10ab15a7dbf9614ec6659cf69add7e0631ce7241).

54. **Exhibit 10 – Enlarged depiction of the initial flow of "SW's" funds from Coinbase through ZC-TXN deposit addresses to Consolidation Address 1**




55. Once a large portion of her stolen funds were aggregated in Consolidation Address 1, they were promptly sent, either in part or in whole, to additional addresses controlled by the scammers. As depicted by the maroon line on Exhibit 11, a portion of the funds was sent from Consolidation Address 1 to Intermediary Address 1 (0x65e8ca0e4407475350dc76e68275caa0ab239b4c). As depicted by the magenta lines in Exhibit 11, another portion of Victim-SW's funds, was sent from Consolidation Address 1 to Intermediary Address 2 (0xc81dfd22ff032ef5ca22b1527b62455169cc37cd). By applying LIFO, approximately 72,305 USDC of 74,978 USDC was forwarded from Consolidation Address 1 to Intermediary Address 2. Victim-SW's funds originally from Deposit Address 2, as depicted by the purple line, were also sent in their entirety over two transactions from Consolidation Address 1 to Intermediary Address 2.

56. **Exhibit 11 – Flow of "SW's" funds out of Consolidation Address 1 to next intermediary addresses**




57. From Intermediary Addresses 1 and 2, Victim-SW's funds, in part or in whole, from all three lines, were then reaggregated into Consolidation Address 2 (0xe26da32fb827f47e36d20f7a877f855943d34bf4) within one to two transaction hops. By applying LIFO, approximately 53,564 USDC (of 74,978 USDC) of the magenta line was forwarded. Once Victim-SW's funds were reaggregated into Consolidation Address 2, the fraudsters used the decentralized exchanges Tokenlon and Curve Finance to convert Victim-SW's USDC to Tether (USDT). A decentralized exchange (DEX) differs from a centralized exchange, in that it is a peer-to-peer marketplace where transactions often occur directly between cryptocurrency traders. Unlike traditional exchanges, DEXs do not rely on centralized intermediaries to facilitate a trade and often lack any Anti-Money Laundering (AML) or Know Your Customer (KYC) safeguards.

58. The inputs from the purple and maroon lines were, in effect, swapped together in one transaction and the output was depicted by a dark blue line on Exhibit 12 – the differing color to signify the combining of two lines of funds. The magenta line was also swapped and remained as a magenta line on Exhibit 12. The funds were then reintroduced into Consolidation Address 2, now denominated as Tether

(USDT). Approximately 244,518 USDT of Victim-SW's now converted funds were then sent to **Target Address 1** where they remain in two large transaction inputs.

59. **Exhibit 12 – Flow of "SW's" funds to Consolidation Address 2, swapping via DEXs Tokenlon and Curve from USDC to USDT, and deposited into Target Address 1 in two large transaction inputs**




60. **Approximately 35,881 USDT of Victim-SW's funds traced to the Binance account of Hong Kong National K.Z.** While the majority of Victim-SW's defrauded funds were initially denominated in the stablecoin USDC, two transactions that had been sent by "SW" to the scam addresses were first denominated as USDT. Using the same generally accepted LIFO accounting principles, approximately 35,881 USDT (of an original amount of 53,688 USDT) from one of "SW's" transactions was traced through several known (Consolidation Address 1 & Intermediary Address 2) and unknown addresses prior to reaching Binance deposit address 0x22a4e036a9c3d1cc009ed4d73b77095bae3aeb98. Based on training provided by Binance, a Binance account holder will maintain the same deposit address for a particular cryptocurrency for the life of the account. In other

words, Binance deposit address 0x22a4e036a9c3d1cc009ed4d73b77095bae3aeb98 is controlled by only one Binance user account, though the account holder may choose to allow additional individuals and/or devices to access their account.

61. In response to a USSS letter request, Binance voluntarily provided account records identifying the account holder as Hong Kong National K.Z. Access logs provided by Binance showed 15 different devices geolocated to Hong Kong and China that had been used to access the account. The involvement of a Hong Kong National as a recipient of a portion of "SW's" funds coupled with the East Asia geolocated devices, further supported that "Victim-SW" had been defrauded by an organized pig butchering criminal syndicate. Additionally, approximately 5 minutes after "SW's" funds had been received in K.Z.'s Binance account, they were withdrawn from Binance, still as Tether, to a cryptocurrency address on the Tron blockchain. This behavior of quickly moving received funds through VASP accounts to external cryptocurrency addresses, is also a common practice employed by scammers in the obfuscation and laundering of stolen funds.

**Back tracing from Target Address 1 to identify additional victims.**

62. Suspecting that Target Address 1 was being used to pool additional fraud proceeds from many victims, the USSS NIFA back traced several large inputs deposited into Target Address 1 to their points of origin at cryptocurrency exchanges. Using this technique, the NIFA quickly located the IC3 complaints of three additional victims whose stolen funds had been traced to Target Address 1. The same generally accepted LIFO accounting principles were used throughout the duration of the forward and back tracing in this investigation.

63. **Victim-HT is defrauded out of $40,021.10 via a pig butchering scam.** On November 13, 2024, the NIFA spoke with Richmond, TX resident, hereafter referred to as Victim-HT, regarding an IC3 complaint that had been filed on April 19, 2024. Victim-HT related that in early 2024, like Victim-SW, he had been added randomly to a WhatsApp group related to cryptocurrency investing. The group,

which contained approximately 200-300 individuals, encouraged any members that were interested to reach out to a related group on the messaging application Telegram. Once in the Telegram group, Victim-HT was directed by scammers within the group to create an account at trade.firstcoinex.com. He was then given instructions on how to trade by an individual named "Martin J. Pullin." When Victim-HT unsuccessfully tried to withdraw his earnings from the platform, he was hit with unceasing fees before his account was closed by the scammers.

64. During the investigation, Victim-HT's Coinbase records were obtained and reviewed by the NIFA. It was confirmed through tracing, that approximately $28,542 (denominated as USDT) of Victim-HT's funds had been sent to **Target Address 1** after first passing through several intermediary addresses that had also been used to move Victim-SW's and other victims' stolen funds.

65. **Exhibit 13 – Flow of HT's funds from Coinbase to Target Address 1**




66. **Victim-MS is defrauded out of $70,000.00 via a pig butchering scam.** On November 14, 2024, the NIFA spoke with Danville, CA resident, hereafter referred to as Victim-MS, regarding an IC3 complaint he filed on May 2, 2024. Victim-MS related that he had been added randomly to a cryptocurrency investing group on WhatsApp (B-107), which was filled with individuals boasting about their cryptocurrency earnings. Intrigued by the success stories, he joined a Telegram Group (C-564 Bitcoin Contract Trading) advertised within the WhatsApp group.

67. Once in the Telegram group, Victim-MS was directed to go to trade.bbc-coin.net where he uploaded his driver's license during the account opening process. Based on my training and experience, I know that it's common for scammers to utilize victims' identification in furtherance of additional fraud schemes.

68. With the assistance of trading analyst "Mr. Martin," Victim-MS was led to believe that his $20,000 investment had quickly grown to approximately $1.24 million. He was instructed to withdraw his funds from the platform but was told, like Victim-SW, that he first had to pay a 5% "Gas" fee of the total (equating to $65k) to complete the withdrawal. Victim-MS realized he had been scammed when he was unable to withdraw any of his funds. Approximately $7,887 (denominated as USDT) of his funds were traced to **Target Address 1**

69. **Exhibit 14 – Photo of BBC-coin.net platform from "MS"**




70. **Exhibit 15 - Flow of MS's funds from Coinbase to Target Address 1**



71. **Victim-LA is defrauded out of $366,555.00 via a pig butchering scam.** During follow-on investigation, the NIFA reviewed a May 2, 2024, IC3 complaint filed by a Dripping Springs, TX resident, hereafter known as Victim-LA.

72. During a phone conversation between the NIFA and Victim-LA on November 13, 2024, Victim-LA essentially related that in March 2024 he had been added to the WhatsApp group "STI Fortune Club," where individuals discussed cryptocurrency trading. After a few days of learning, he reached out to "Courtney" on Telegram, whom members of the WhatsApp group had been encouraged to contact. Once in Telegram group "C-507 Bitcoin Contract Trading," Victim-LA was guided on how to trade cryptocurrencies by group analyst "Martin J. Pullin." At the scammer's direction, Victim-LA was asked to invest the stablecoin USDC into the fraudulent platform 'trade.firstcoinex.com' and execute trades at their direction. Victim-LA was led to believe that his account had grown in excess of $1 million. By way of reference, as set forth above, both "Martin J. Pullin" and 'trade.firstcoinex.com' were also mentioned in Victim-HT's IC3 complaint.

73. Victim-LA was directed to withdraw funds from his account but was told he first had to pay a "Gas" fee of 5%, of which he paid a portion. Victim-LA was then told he needed to pay an additional "Gas" fee. Victim-LA was continuously met with unending fees which he initially paid via loans or by liquidating his personal investment accounts. He eventually realized he had been scammed after depositing over $300,000 into the fraudulent platform.

74. In his IC3 complaint, Victim-LA related that he had sent a transaction of 153,460 USDC to Ethereum address 0xb5f4e329ac794db66219afee9fddbc23c59d0948 (LA Deposit Address 1) to cover one of the fees. By applying LIFO accounting principles, the NIFA traced approximately 40,427 USDT from this transaction through intermediary addresses to **Target Address 1**. Like Victim-SW's funds, Victim-LA's funds had been

converted via Tokenlon from their original form as USDC to USDT prior to being sent by the scammers to **Target Address 1**.

75. Upon further review of Victim-LA's Coinbase records and his IC3 complaint, it was determined that an additional 56,597 USDT (sum of three additional transactions) in **Target Address 1** had come from Victim-LA's Coinbase account. This equated to approximately 97,024 USDT in total.

76. **Exhibit 16 - Flow of LA's funds from Coinbase to Target Address 1**




77. **Known Victims of Target Address 1.** As of February 21, 2025, the USSS had spoken with 17 victims throughout the United States who had a portion of their funds, equating to approximately $717,783.00, sent to **Target Address 1**. This amount does not include the funds of approximately 21 additional US-based individuals that had thus far been unreachable, or the funds of numerous foreign nationals that had also been traced to **Target Address 1.**

78. **Table 2 – Identified victims of Target Address 1**

Summary of known victim transfers to Target Address 1

| Victim | Date Spoke To USSS | City/State | Reported Loss | Proceeds in Wallet | Scam Website | Scammer Name |
|---|---|---|---|---|---|---|
| "LA" | 11/13/2024 | Dripping Springs, TX | $366,555.00 | $97,024.00 | trade.firstcoinex.com | Martin Pullin |
| "NB" | 12/12/2024 | Santa Barbara, CA | $150,000.00 | $29,731.00 | ZC-TXN.com | Logan Davis |
| "DC" | 12/13/2024 | Bremerton, WA | $15,000.00 | $10,004.00 | Cryptocurrency-trading.com | Martin |
| "JH" | 12/10/2024 | Boca Raton, FL | $23,000.00 | $19,397.00 | PCP-exchange.com | |
| "MH" | 12/11/2024 | Naples, FL | $300,000.00 | $21,118.00 | Multiple | Evelyn |
| "RL" | 2/5/2025 | Winter Springs, FL | | $53,550.00 | Titanmacrofx.com | Charles |
| "BL" | 12/11/2024 | Monsey, NY | $70,000.00 | $4,996.00 | CEXcrypto.com | |
| "PS" | 12/11/2024 | Edison, NJ | $200,000.00 | $106,354.00 | trade.bbc-coin.net | Martin Pullin |
| "DS" | 12/10/2024 | Plainfield, IN | $300,000.00 | $38,875.00 | buy-coin.net | |
| "MS" | 11/14/2024 | Danville, CA | $20,000.00 | $7,887.00 | trade.bbc-coin.net | Martin |
| "BS" | 12/16/2024 | Exton, PA | $75,000.00 | $12,004.00 | Usecoin | Martin Pullin |
| "HT" | 11/13/2024 | Richmond, TX | $40,021.10 | $28,542.00 | trade.firstcoinex.com | Martin Pullin |
| "AH" | 12/18/2024 | DeSoto, TX | $30,000.00 | $12,478.00 | Multiple | |
| "SH" | 1/21/2025 | Sunnyvale, CA | | $9,758.00 | trade.cryptocurrency66.com | |
| "SP" | 12/18/2024 | Kansas City, MO | $80,000.00 | $5,000.00 | GlobalTrade.BBC/coin.net | Martin Pullin |
| "ZM" | 1/21/2025 | Tampa, FL | | $16,547.00 | TNX | Martha |
| "SW" | 11/14/2024 | Carlsbad, CA | $528,163.00 | $244,518.00 | ZC-TXN.com | Logan Davis |
| | | | | | | |
| | | | $2,197,739.10 | $717,783.00 | | |

**Identification of Target Address 2**

79. By applying LIFO accounting principles for the remaining amount of Victim-LA's 153,460 USDC transaction, the NIFA traced 111,033 USDC of it through Intermediary Address 1 (as set forth above) (0x65e8ca0e4407475350dc76e68275caa0ab239b4c), prior to being sent to Ethereum address 0x01d67d820ca9cef8e1ace7b6bdce176b93bef604 in a 150,000 USDC transaction. By using a combination of decentralized exchanges (Uniswap V3 / OKX) and a cryptocurrency bridge (SWFT Bridge), the scammers swapped 111,033 USDC of Victim-LA's funds to USDT and then bridged the USDT funds from Ethereum to the Tron blockchain in a single transaction (Ethereum Tx hash: 0x8b4872607ce61d68cc216ab9d20ddc383eebec9ab58bce9faa301d617923ac4b). By conducting blockchain analysis and examining the transaction logs for the associated Ethereum transaction, it was determined that Victim-LA's funds were sent to Tron address TJXJRjcYDWSQDx8W1rRqDZBC3c4Mj4qft6 (Tron Address 1) upon exiting the bridge. See Exhibits 18-19 below.

80. **Exhibit 18 – Ethereum log of bridging Victim LA's funds from Ethereum to Tron blockchain**




81. Victim-LA's funds were then sent by the scammers to TRfAgJaahb71zaoXm6AoNS7JmCvQUzsxtd (**Target Address 2**) on May 12, 2024, where they remain. As of December 12, 2024, **Target Address 2** was holding approximately 2,649,824.66 USDT which was frozen by law enforcement that day under suspicion of being fraud proceeds. Prior to being frozen, **Target Address 2** had not had any significant activity since May 27, 2024. The transfer involving Victim-LA's funds to **Target Address 2** was the penultimate transfer into the address before it went dormant for an extended period of time.

82. **Exhibit 19 – "Victim-LA's" transactions to Target Address 1 & Target Address 2**



**Reverse Tracing from Target Address 2 to Identify Additional Victims**

83. Suspecting that **Target Address 2** was also being used to pool fraud proceeds, the USSS NIFA back traced two additional large inputs (May 27, 2024 - $697,000 in USDT; May 9, 2024 - $300,000 in USDT) into **Target Address 2** to their respective points of origins.

84. **Backtrace of 697,000 USDT from Target Address 2 (May 27, 2024 - last significant transaction) to Target Address 1.** Prior to being deposited into **Target Address 2,** where it remains, the 697,000 USDT could be directly back traced to Tron address TJXJRjcYDWSQDx8W1rRqDZBC3c4Mj4qft6 in Tron Tx hash: 3417bbac475b567d5de0f609cfff8977c71e2451721bbc996ea199e1dbab27b4. This address, which was the same intermediary Tron address used to receive a portion of Victim-LA's stolen funds, received the 697,000 USDT via two transactions on May 27, 2024 (191,375.96 USDT & 497,402.51 USDT) via the SWFT Bridge (Tron Tx hashes: ea99fa90b90e679ba9253451717c64fa2b04d570c1790cf6a6fa5d1265aa73d6 & ecb6f8c76b366d3b917e6020c26696009be9da123daf50adae7782cec9e86764). Using a public blockchain explorer, both of these transactions were back traced through the bridge to Ethereum address 0x01d67D820cA9CEF8E1ace7B6bDce176b93BEF604 (Ethereum Tx hashes: 0x1f0652dba3f9f67808b3a0096f5bc369892a3715a87b3c581993781505dbbe5f & 0xe14aa0de92cbaec1fb76493e16a8e04e2b853e6027e4692947f34d99422db0a7). This was further verified by examining the Ethereum transaction logs for the two transactions showing the output of Ethereum address 0x01d67D820cA9CEF8E1ace7B6bDce176b93BEF604 for both transactions to be Tron address TJXJRjcYDWSQDx8W1rRqDZBC3c4Mj4qft6. Prior to being bridged to the Tron blockchain via the SWFT Bridge and denominated in USDT, these transactions had been denominated in Ethereum (48.9 ETH & 127 ETH = 175.9 ETH).

85. **Exhibits 20 & 21 – Logs showing swap of Ethereum to USDT prior to being bridged to Tron blockchain.**







86. **Exhibits 22 & 23 – Bridging of funds from Ethereum to Tron blockchain**






87. Preceding 0x01d67D820cA9CEF8E1ace7B6bDce176b93BEF604, the 176 ETH bridged to Tron had briefly passed through Ethereum address 0x1bc1181da9c5be7ed9f0be13fdb9e5d4e1e8d348, back to 0x01d67D820cA9CEF8E1ace7B6bDce176b93BEF604, and then to **Target Address 1.** The entire process of the funds being sent from **Target Address 1** through the intermediary addresses, being swapped, bridged to the Tron blockchain, and then sent to **Target Address 2** started on May 27, 2024, at 14:14 UTC and concluded on May 27, 2024, at 15:02 UTC -- approximately 46 minutes. Based on my training and experience, I know that scammers will rapidly move stolen funds, such as in this case, and utilize swaps and bridges in order to obfuscate the funds origin and make tracing difficult. I also know that scammers will make circular transactions, as in this case, where funds are moved back and forth between the same addresses as further attempts to obfuscate the flow of funds.

88. **Exhibit 24 – Simplified graph of transfer of Ethereum from Target Address 1, subsequent swap & bridging from Ethereum to Tron blockchain, and deposit to Target Address 2**




89. Using LIFO, the NIFA then back traced portions of Ethereum that could be clearly traced to **Target Address 1** to their points of origin.

90. **Victim-BS is defrauded out of approximately $75,000 via a pig butchering scam, and a portion of his funds were traced to both Target Address 1 & Target Address 2.** During the course of the investigation, the NIFA contacted

an Exton, PA resident, hereafter referred to as Victim-BS. Victim-BS related that around Thanksgiving 2023, he too had been contacted via WhatsApp messenger regarding a cryptocurrency investment opportunity. After joining an associated Telegram group, "BS" began working with a trading advisor named "Martin J. Pullin." As of the time of this writing, 7 victims whose funds had been traced to the Target Addresses had reported being advised by a "Martin" or "Martin Pullin." Victim-BS, who hadn't reported the incident due to feeling "shamed," had invested approximately $75,000 into an investment platform named "Usecoin." Similar to the other victims, "BS" was directed to pay "gas fees" in order to withdraw his funds. Victim-BS was never able to withdraw his funds.

91. **Portions of Victim-BS's funds were traced to Target Address 1 and Target Address 2.** By using LIFO, it was determined that approximately 12,004 USDT of Victim-BS's funds had been traced to **Target Address 1**, and approximately 3.31069659 ETH (valued at approximately $7,556.12 at the time of transaction – December 14, 2023) had been traced to **Target Address 2.**

92. **Exhibit 25 – Flow of portion of "BS's" funds to Target Address 1 & Target Address 2**



93.**Victim-RD is defrauded out of approximately $300,000 via pig butchering scams, $10,036.51 traced to Target Address 2.** On February 25, 2025, the NIFA conversed with a Sun Lakes, AZ resident, hereafter Victim-RD. Like the other victims, Victim-RD answered a cryptocurrency advertisement on WhatsApp, which redirected him to a group on Telegram. The group purported to have specialized "signals" informing him when to execute trades for large profits. After

executing trades on various platforms at the direction of the scammers, Victim-RD was led to believe that his $300,000 investment from Ethereum and wired funds had grown to over $2,000,000. When Victim-RD tried to withdraw his funds, he was met with unceasing fees for taxes, website support, etc., causing him to realize he had been scammed. The NIFA traced 10 small denomination Ethereum transactions equating to approximately 2.862 Ethereum ($10,036.51 at time of purchase) from Victim-RD's Robinhood account to Target Address 2.

94. **Exhibit 26 – Flow of "Victim-RD's" funds to Target Address 2**




95. **Backtrace of 300,000 USDT from Target Address 2.** On May 9, 2024, approximately three days prior to receiving Victim-LA's funds, **Target Address 2** received 300,000 in USDT. It was determined via back tracing that these funds had come from two addresses at the sanctioned cryptocurrency exchange Garantex. Additionally, like the 300,000 USDT, it was determined via blockchain analytics tools that an additional $2.2 million in **Target Address 2** was deposited there within three transaction hops from an account at Garantex.

96. **Exhibit 27 – 300,000 USDT from Garantex to Target Address 2**




**104. Exhibit 28 Relationship between Target Address 2 to Garantex**




97. **Garantex sanctioned by OFAC (Office of Foreign Assets Control – United States Treasury Department.** In April 2022, the US Department of Treasury sanctioned the Russian cryptocurrency exchange Garantex. Per a US

Department of Treasury press release, over $100,000,000 in known Garantex transactions had been linked to illicit actors and darknet markets, to include $6,000,000 from Russian RaaS (ransomware-as-a-service) gang Conti.

98. **Garantex suspect arrested, funds and domain seized.** In March, 2025, the US Secret Service, US Department of Justice, and numerous foreign law enforcement partners (Dutch National Police, German Federal Criminal Police Office, Finnish National BOI, etc.) seized the Garantex domain. Additionally, $26 million in fraud proceeds were frozen, and one of its key operators (Lithuanian National Alexsej Besciokov) was arrested in India. Per press release, Garantex had processed at least $96 billion in cryptocurrency transactions since 2019.

99. According to Besciokov's indictment, Garantex continued to operate despite knowing it had been added to OFAC's SDN (Specially Designated Nationals) list. During that time, Garantex took proactive steps to prevent cryptocurrency exchanges, to include those based in the United States, from detecting that they were transacting with Garantex.

100. **Exhibit 29 -- Photo of seized Garantex domain.**



101. **Individual contacts Tether Compliance and the US Secret Service claiming Target Address 1 belonged to them.** Between January 30, 2025 and March 7, 2025, an individual identifying him/herself as "San vergola" (santiago//ponduck.com & lonsemi11//gmail.com) contacted Tether and the US Secret Service claiming to be the owner of Target Address 1. On March 7, 2025, the NIFA responded to "San vergola" via email (lonsemi//gmail.com) and informed him/her that Target Address 1 had been linked to a cryptocurrency scam. "San vergola" was asked to provide detailed information about themselves (full name, DOB, address, photo of themselves holding up government ID, etc.) and their relationship with the account (how they acquired the funds, what they were used for, exchange trading accounts used, etc.). As of April 14, 2025, "San vergola" had not responded or made further inquiries about Target Address 1. The lack of substantive or continued engagement from the alleged owner of Target Address 1 or from any legal counsel claiming to represent the owners of the Target Addresses provide additional support for my belief that there are no funds contained in the Target Addresses that are unrelated to money laundering.

102. A March 2025 subpoena return for Google mail (Gmail) address lonsemi//gmail.com, revealed that the recovery phone number (+85252674822) was Hong Kong based. Additionally, the IP addresses associated with lonsemi//gmail.com resolved to Hong Kong, Singapore, and Taiwan. The involvement of an email account with ties to East Asian countries, which had been used in an attempt to claim the funds in Target Address 1, further supported that these funds were the laundered proceeds of a criminal syndicate.

103. **Second individual contacts Tether Compliance claiming that Target Address 1 belonged to them.** On April 03, 2025, the USSS NIFA was contacted by Tether regarding a second individual ("Li Dongliang" - dongliang9//outlook.com) who also claimed ownership of Target Address 1. On April 4, 2025, "Li Dongliang"

was emailed and also asked to provide detailed information about themselves (full name, DOB, address, photo of themselves holding up government ID, etc.) and their relationship with the account (how they acquired the funds, what they were used for, exchange trading accounts used, etc.). As of April 15, 2025, "Li Dongliang" had not responded or made further inquiries about Target Address 1.

104. **Fraudulent cryptocurrency websites used to defraud the victims.** During the investigation, at least seven fraudulent cryptocurrency websites and/or related domains were identified that had been used to defraud known victims. Many of these websites were linked by the recurring name Martin Pullin. Two other domains (bbc-coin.net & firstcoinex.com) had been used to defraud multiple victims. Other domains, such as ZC-TXN.com and Ponduck (used to claim ownership of Target Address 1), used the address for UK pawnbroker 'Ramsdens' (2 Bridge Street, Haverfordwest, Wales) at the time of the website's registry. Each victim presented similar stories of how they had been defrauded, irrespective of which domain had been used. None of these websites seemed to serve any legitimate purpose and appeared to exist for the sole purpose of defrauding victims.

| Website/Platform | Website Registrar | Registration Date | Scammer Name |
|---|---|---|---|
| bbc-coin.net | Cloudflare | December 16, 2023 | Martin Pullin |
| firstcoinex.com | Gname 173 Inc. | June 10, 2024 | Martin Pullin |
| usecoin.com | Dynadot, Inc. | February 21, 2012 | Martin Pullin |
| cryptocurrency-trading.com | RegistryGate | March 23, 2017 | Martin |
| pcp-exchange.com | NewFold | November 8, 2022 | |
| zc-txn.com | Tucows Domains | April 22, 2024 | Logan Davis |
| ponduck.com | New Fold | May 26, 2024 | San vergola |

## SEIZURE PROCEDURE FOR THE TARGET PROPERTY

105. I respectfully submit that the foregoing establishes probable cause to believe that the funds held in **Target Address 1 & 2** are subject to civil and criminal forfeiture, as they are involved in wire fraud and money laundering.

106. Should this seizure warrant be granted, law enforcement intends to work with Tether to seize the funds associated with the Target Addresses. In sum, the accompanying warrant would be transmitted to Tether, at which time Tether would

"burn" (*i.e.*, destroy) the Target Addresses at issue (and by extension the USDT tokens associated with them). Tether would then reissue the equivalent amount of USDT tokens associated with the Target Addresses and transfer that equivalent amount of USDT to a government-controlled wallet. The seized currency will remain in the custody of the U.S. government during the entire pendency of the forfeiture proceedings, to ensure that access to, or manipulation of, the forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior consultation by the United States.

## CONCLUSION

107. Based on information derived from the foregoing investigation, there is probable cause to conclude that Target Address 1 & 2 contain the proceeds of a wire fraud scheme in violation of Title 18, United States Code, Section 1343. Those proceeds include 717,783 USDT from **Target Address 1** and 118,589 USDT from **Target Address 2**. Moreover, considering approximately seventeen victim reports were connected to **Target Address 1** with additional victims yet to be interviewed, there is probable cause to believe that the proceeds of other schemes—pig butchering or otherwise—make up the remaining balance. Although there are only presently two known victims for **Target Address 2** that have been interviewed at this time, the wallet had over $2,000,000 in exposure to the OFAC sanctioned exchange Garantex. Additionally, a portion of the fraud proceeds in **Target Address 2** had first passed through **Target Address 1**, thus linking the two fraudulent addresses together as involved in a common fraud and money laundering scheme. Accordingly, as set forth above, the entire balances of **Target Address 1 & 2** are subject to seizure and forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

108. Furthermore, there is probable cause to believe that the entire amount of funds in each of the two Target Addresses constitute property involved in money laundering transactions, and as described above, that the subjects knew the

transactions were designed in whole or in part to conceal the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. The entirety of each Target Address is, accordingly, subject to forfeiture and seizure pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1).

109. I respectfully request that a warrant be issued authorizing the seizure of the funds in the Target Addresses with the goal of returning these funds to the victims impacted by the various scams implicated in this investigation.

110. I submit that a protective or restraining order issued pursuant to 21 U.S.C. § 853(e) would be insufficient to ensure the availability of the funds in the Target Addresses for forfeiture. Cryptocurrency can be transferred faster than traditional bank funds, and once transferred, generally cannot be recalled to an original wallet. Moreover, there is a risk that the funds may be moved to a location where no forfeiture or seizure would be possible, at which point the funds could be further laundered into a "privacy" (i.e., untraceable) cryptocurrency. Thus, I respectfully submit that a seizure warrant is the only means to reasonably assure the availability of the funds in the Target Addresses for forfeiture.

111. Based on the foregoing, I respectfully request that the Court issue the seizure warrant for all funds, **in their entirety**, for Target Address 1 & 2.

Jeremy Keeney
Special Agent
US Secret Service

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on April 16, 2025.

The Honorable Michael Berg
United States Magistrate Judge